IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALBERT R. LEMMON,                                    CV 07-6020-AA
                    Plaintiff,

v.                                                   OPINION AND
                                                     ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                    Defendant.
_____

AIKEN, Judge:

## INTRODUCTION

Plaintiff Albert R. Lemmon brings this action for judicial review of a final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application

for Social Security disability insurance benefits ("DIB") under Title II and Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act. This court has jurisdiction under 42

U.S.C. § 405(g). For the reasons set forth below, the Commissioner's final decision is reversed

and remanded for the calculation and award of benefits.

BACKGROUND

Lemmon was 43 years old on the date of the hearing in May 2006. He completed ninth

grade and later obtained a GED. He worked in the past doing building maintenance. Tr. 80.[1]

Lemmon alleges disability due to attention deficit hyperactivity disorder ("ADHD"),

sleep apnea, vertigo, carpal tunnel syndrome, memory loss, and excessive daytime sleepiness.

Tr. 79, 120. He claims these conditions cause the following symptoms: inability to concentrate

or make decisions, memory loss, extreme fatigue, daytime sleepiness, bouts of lightheadedness,

difficulty grasping and holding things, inability to remember appointments, eat or take

medications on schedule, and an inability to deal with money. Tr. 79, 106, 120, 124. Lemmon

testified that he must take two to three naps per day, that the naps last two to three but sometimes

seven hours, and that when he is tired he passes out as opposed to choosing to nap. Tr. 549.

Lemmon testified that he experiences mood swings, and others testified that he has anger

problems, and that his personality has changed over time. Tr. 115, 550, 563. Lemmon also has

gambling problems. Finally, Lemmon has bipolar disorder.

Lemmon stopped working when he was fired from his last job due to attendance

problems, daytime fatigue, and difficulty with concentration. His wife testified that he was fired

because of his sleeping problems and an inability to be productive at work. Tr. 560-61.

Lemmon filed applications for DIB and SSI benefits on Ocober 31, 2003, alleging

disability beginning May 15, 2001. Lemmon's applications were denied initially and upon

reconsideration. On May 22, 2006, a hearing was held before an Administrative Law Judge

---

[1]Citations are to the page(s) indicated in the official transcript of the administrative record
filed with the Commissioner's Answer.

("ALJ"). In a decision dated September 27, 2006, the ALJ found Lemmon not disabled and therefore not entitled to benefits. The Appeals Council denied Lemmon's request for review, making the ALJ's decision the final decision of the Commissioner.

## STANDARDS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039 (citation omitted). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## MEDICAL RECORDS

The medical records accurately set forth Lemmon's medical history as it relates to his

Page 3 - OPINION AND ORDER

claims. The court has carefully reviewed the records, and the parties are familiar with them.
Accordingly, only a brief summary appears below.

Lemmon began psychiatric treatment in 1997 and was diagnosed with ADHD, a
depressive disorder NOS with anxiety, and obsessive compulsive disorder ("OCD"). Throughout
1997, his psychiatrist noted ongoing memory problems, obsessive thoughts, and irritability. He
was assessed a GAF of 49 in January 1998, a GAF of 50 in February 2002, and a GAF of 40 in
July 2004. He continued psychiatric treatment over the years. His primary care physician noted
in August 2003 that Lemmon had worsening memory problems, temper flareups, was angry, was
repeating himself more frequently, and that his family noted personality changes. Lemmon
received a neurological consultation in September 2003 which noted odd behaviors and
personality changes, dizziness, memory problems, and a history of sleep apnea and excessive
limb movement. The physician noted that Lemmon's hypersomnolence[2] may be connected to
memory problems. An MRI of the brain and EEG performed subsequently were normal. In
October 2003, the neurologist opined that Lemmon's memory problems and personality changes
could be sleep disorder related or psychiatric.

In April 2004, Lemmon received a neuropsychological evaluation which included a full
battery of standardized tests. He scored in the impaired range on some tests, including the IQ test
and the memory test. The neuropsychologist's evaluation included: cataplexy and narcolepsy,
obstructive sleep apnea, possible restless leg syndrome, a cognitive disorder NOS, an anxiety
disorder NOS, and pathological gambling. Lemmon was found to be mildly retarded or in the
borderline range of intelligence. The previous diagnosis of ADHD was judged as accurate, but

---

[2] Hypersomnolence is an excessive need for sleep, especially during the day.

Page 4 - OPINION AND ORDER

the examining physician opined that other psychological factors were present and that stress

would cause Lemmon to revert to an earlier stage of development. He recommended a

psychological consultation and ongoing counseling. In July 2004, another mental health

professional opined that Lemmon's memory was so impaired that he would be unlikely to benefit

from cognitive based therapy. In April 2006, Lemmon's treating physician diagnosed bipolar

disorder and placed him on Depakote after noting that his memory issues were getting worse

over the last year, that his anger levels had increased, that he was irritable and yelling at his

family, and that he talked to himself. Medication improved Lemmon's anger outbursts.

Lemmon had a long history of sleep problems. The diagnosis of sleep apnea dates back

to 1997, and his use of a C-PAP machine was continuous though some physicians noted that the

machine needed servicing at various times. Lemmon was evaluated at a sleep lab in August 2002

and was diagnosed with severe obstructive sleep apnea, and moderate periodic limb movement

disorder.[3] His sleep latency was between normal and pathologic. One physician did not believe

he was narcoleptic. He was followed for excessive daytime sleepiness and cognitive dysfunction,

and different medications were prescribed to address a diagnosis of complex sleep disorder and

idiopathic hypersomnia.[4] Medication improved the periodic limb movement but did not cure

Lemmon's ongoing daytime sleepiness. In November 2003, Lemmon was tried on Ritalin to

---

[3] Periodic limb movement disorder is characterized by leg movements or jerks which typically occur every 20 to 40 seconds during sleep, causing sleep to be disrupted and leaving the person with excessive daytime sleepiness. In most cases, the bed partner typically reports these movements.

[4] Idiopathic hypersomnia is a disorder of excessive sleepiness in which the affected individual sleeps longer than normal (greater than 10 hours), is excessively sleepy, falls asleep at inappropriate times, and frequently takes naps. The exact cause of this disorder is unknown.

improve daytime sleepiness.  In December 2003, Lemmon participated in a two-day sleep study which found substantial daytime sleepiness that could be idiopathic hypersomnia in addition to severe obstructive sleep apnea.  The physician opined that Lemmon's cognitive dysfunction and personality alteration were striking and could be due to sleep apnea or other sleep problems.  He also mentioned the possibility that Lemmon could have intellectual decline that was significant.  In March 2004, Lemmon's treating physician noted that his memory problems were worsening, he was having personality changes, he was having difficulty functioning on his own, and that medication had not stopped his kicking and punching at night.

In June 2002, Lemmon began experiencing carpal tunnel syndrome symptoms and in July 2002, he received a positive diagnosis of bilateral carpal tunnel syndrome, left greater than right.  He had carpal tunnel release surgery on the left in October 2002.  He continued to have some pain with bearing weight in December 2002.  He complained of a loss of feeling in his right fingers in April 2004.

In August 2003, Lemmon's ongoing dizziness and lightheadedness was diagnosed as benign positional vertigo and he was given medication and exercises.  The medication did not alleve Lemmon's dizziness.  In April 2004, he told one physician that he had vertigo for a year but it appeared to be resolving.

In August 2004, Lemmon was diagnosed with diabetes.  Though he was often negligent in testing his blood sugar levels, his treating physician found that his diabetes was under excellent control in April 2006.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999):

Step One. The ALJ determines whether claimant is engaged in substantial gainful

activity. If so, claimant is not disabled. If claimant is not engaged in substantial gainful activity,

the ALJ proceeds to evaluate claimant's case under step two. 20 C.F.R. §§ 404.1520(b),

416.920(b).

Step Two. The ALJ determines whether claimant has one or more severe impairments

significantly limiting him from performing basic work activities. If not, the claimant is not

disabled. If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's

case under step three. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Three. The ALJ next determines whether claimant's impairment "meets or equals"

one of the impairments listed in the Social Security Administration ("SSA") regulations found at

20 C.F.R. Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's impairment

does not meet or equal one listed in the regulations, the ALJ's evaluation of claimant's case

proceeds under step four. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Step Four. The ALJ determines whether claimant has sufficient residual functional

capacity ("RFC") despite the impairment or various impairments to perform work he or she has

done in the past. If so, claimant is not disabled. If claimant demonstrates he or she cannot do

work performed in the past, the ALJ's evaluation of claimant's case proceeds under step five. 20

C.F.R. §§ 404.1520(e), 416.920(e).

Step Five. The ALJ determines whether claimant is able to do any other work. If not,

claimant is disabled.  If the ALJ finds claimant is able to do other work, the ALJ must show a

significant number of jobs exist in the national economy that claimant can do.  The ALJ may

satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the

Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the ALJ

demonstrates a significant number of jobs exist in the national economy that claimant can do,

claimant is not disabled.  If the ALJ does not meet this burden, claimant is disabled.  20 C.F.R.

§§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At step five, the burden shifts to the ALJ to show that the claimant can perform jobs that

exist in significant numbers in the national economy.  Id.

### THE ALJ'S FINDINGS

At step one, the ALJ found that Lemmon  had not engaged in substantial gainful activity

at any time relevant to this decision.  Tr. 17.  This finding is not in dispute.  At step two, the ALJ

found that Lemmon had the following severe impairments:  diabetes mellitus which is well-

controlled, obstructive sleep apnea and questionable narcolepsy currently under treatment with

C-PAP, a cognitive disorder which is possibly attention deficit hyperactivity disorder, an anxiety

disorder, adjustment disorder, pathological gambling, and bipolar disorder.  Tr. 18.  This finding

is not in dispute.  At step three, the ALJ found that Lemmon's impairments were not severe

enough to meet or medically equal any of the listed impairments of 20 C.F.R. Part 404, Subpart

P, Appendix 1.  Tr. 19.  This finding is in dispute.

Next, the ALJ assessed Lemmon as having the residual functional capacity to perform

medium exertion work, however the ALJ also assessed an extraordinary number of limitations.

Tr. 20. The ALJ found that Lemmon was limited to lifting no more than fifty pounds, and lifting

and carrying 25 pounds frequently. The ALJ found that Lemmon could sit, stand or walk six

hours of an eight-hour work day. The ALJ found that Lemmon could not work on scaffolding,

must avoid dangerous hazards such as unprotected heights or moving machinery, and could

occasionally climb stairs, ramps or balance. The ALJ found that Lemmon was limited to simple

tasks as he has difficulty understanding, remembering and carrying out detailed or complex

instructions. The ALJ found that Lemmon may need to use a list, and that he could maintain

attention to simple tasks for two hours, but should not be expected to concentrate for extended

periods. The ALJ found that Lemmon was unable to independently formulate work plans and

goals or to consistently interact with the public beyond occasional or superficial exchanges, and

that was unable to consistently coordinate closely with teamwork endeavors. The ALJ's RFC

finding is in dispute.

At step four, the ALJ found that Lemmon could not perform his past relevant work. Tr.

28. This finding is not in dispute. At step five, relying on vocational expert testimony, the ALJ

found that Lemmon could work as a laborer in salvage, a bottle packer, and hand packager.[5] Tr.

30. This finding is in dispute.

## DISCUSSION

Lemmon contends the ALJ erred by: (1) improperly rejecting the medical opinions of Dr.

Kasschau; (2) improperly rejecting Lemmon's testimony based on credibility; and (3) failing to

---

[5] Given the additional limitations assessed in the RFC, the VE testified at step five that
the number of existing positions in the economy would have to be reduced to eliminate positions
requiring teamwork, adjustment to various tasks, inability to maintain concentration for extended
periods, and needing to carry a list. The VE reduced the number of existing jobs for the salvage
position by 50%, reduced the bottle packer number by 40%, and reduced the packager number by
50%. Tr. 30.

provide sufficient reasons for rejecting lay witness testimony.

Medical Opinions of Dr. Kasschau

     Michael F. Kasschau, M.D. is Lemmon's treating physician.  In the Ninth Circuit, "where [a] treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons."  Lester v. Chater, 81 F.3d 821, 830, (9th Cir. 1995), quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).  "Clear and convincing reasons" are also required to reject the treating doctor's ultimate conclusions.  Id., citing Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  If a treating physician's opinion is contradicted by that of another physician, specific and legitimate reasons supported by substantial evidence in the record are required to reject the treating physician's opinion.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001).  If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  Holohan, 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, the court credits that opinion as a matter of law.  Lester, 81 F.3d at 834.

     Lemmon specifically takes issue with the ALJ's rejection of a letter written by Dr. Kasschau to Lemmon's attorney on March 23, 2006.  Tr. 456-57.  In that letter, Dr. Kasschau opined that "the combination of his diabetes, borderline retardation, gambling addiction, ADHD, sleep issues . . . and sleep apnea probably combined would make it very difficult for him to hold a set job for extended periods of time."  Id.  Dr. Kasschau also wrote that Lemmon's difficulties with remembering things without prompting, following through with activities, his flat affect,

Page 10 - OPINION AND ORDER

and his apathetic attitude would lead to problems with supervisors and problems with attending

work on a regular basis without excessive absences. Id.

The ALJ dismissed Dr. Kasschau's opinion without relying on substantial evidence in the

record to contradict this treating physician's assessment. The ALJ did not disagree with Dr.

Kasschau's conclusion that Lemmon had a number of severe impairments including diabetes,

obstructive sleep apnea, a cognitive disorder or ADHD, an anxiety disorder, an adjustment

disorder, pathological gambling, and bipolar disorder. And while the ALJ noted correctly that

the ultimate issue of disability is reserved to the Commissioner, the ALJ failed to offer the

required clear and convincing reasons for discrediting Dr. Kasschau's opinion that Lemmon's

combination of severe impairments would make him incapable of sustaining employment. In

evaluating whether a claimant satisfies the disability criteria, the ALJ must evaluate the

claimant's ability to work on a sustained basis. 20 C.F.R. § 404.1512(a); see also Lester, 81 F.3d

at 833.

The ALJ also failed to address Dr. Kasschau's opinion that Lemmon's mental problems

would lead to problems with supervisors but instead offered the unconvincing conclusion that

"how a supervisor would respond is a vocational rather than a medical issue, i.e. not the

physician's discipline." Tr. 25. This court disagrees. Dr. Kasschau relied on a long treating

relationship and the record evidence that included psychological and neuropsychological

evaluations in assessing Lemmon's ability to function in the workplace. This court must

consider the record as a whole in evaluating the ALJ's decision, such that Dr. Kasschau's opinion

was entitled to some weight based on length of the treatment relationship, the nature and extent

of that relationship, and the degree to which his opinion is supported by medical evidence in the

Page 11 - OPINION AND ORDER

record. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986) (record as a whole must be

considered to determine if the Commissioner's decision is supported by substantial evidence); 20

C.F.R. §§ 404.1527(d), 416.927(d) (grounds for affording significant weight to treating

physician's opinion). Also, Dr. Kasschau's assessment is remarkably similar to DDS reviewing

physician Dr. Lahman's assessment that Lemmon was markedly limited in his ability to respond

appropriately to changes in a work setting, and moderately limited in a number of other areas

including the ability to carry out detailed instructions, and maintain attention and concentration

for extended periods. Tr. 278-79. The only medical evidence the ALJ cites in discrediting Dr.

Kasschau is Lemmon's MCMI-III test, administered by Dr. Kurlychek, which the ALJ wrote

"suggested only mild anxiety features." Tr. 25-26. However, the ALJ ignored Dr. Kurlychek's

contemporaneous conclusion with regard to Lemmon's MCMI-III that it "suggests that, when

under stress he reverts back to an earlier stage of development which involves increased

dependency, self-doubt, and distrust." Tr. 207. This evidence would seem to support Dr.

Kasschau's conclusion that the rigors of a full-time job may be beyond Lemmon's capabilities.

Overall, Dr. Kurlychek's neurospsychological assessment which found mild retardation,

difficulties on tasks requiring attention, concentration and memory, severe limitations with

regard to academic pursuits, and long-term psychological problems exacerbated by sleep issues

does not contradict Dr. Kasschau's assessment of March 23, 2006. Because the ALJ failed to

provide sufficient evidence to reject the opinion of a treating physician, that opinion should be

credited as true as a matter of law. Lester, 81 F.3d at 834.

Lemmon's Credibility

Lemmon argues that the ALJ erred in discrediting his symptom testimony. If there is

medical evidence of an underlying impairment, the ALJ may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" Lester, 81 F.3d at 834 (citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id. In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. Smolen, 80 F.3d at 1284 (citations omitted).

The ALJ questioned Lemmon's credibility on a number of grounds, none of which this court finds persuasive. First, the ALJ questioned Lemmon's credibility in setting his alleged onset date at May 15, 2001, and wrote that Lemmon had not sought medical treatment for at least a year after that date. Tr. 18. However, the record shows that the ALJ is simply incorrect: Lemmon was treated at Linn County Mental Health on August 27, 2001 (Tr. 484), and treated on an ongoing basis by Linn County Mental Health physician Dr. Smolen on November 27, 2001, January 8, 2002, January 29, 2002, March 5, 2002, and April 2, 2002. (Tr. 482, 481, 474, 473). She diagnosed ADHD, depression, and sleep apnea. The ALJ erred in questioning Lemmon's credibility regarding the alleged onset date based on received medical care in the year after May 15, 2001.

Page 13 - OPINION AND ORDER

The ALJ also points to Lemmon's work history to impugn his credibility.  In September

2003, Lemmon reported to a physician that he tried to help out at the family restaurant, but that

he had not worked for five years.  Tr. 197.  Because Lemmon's alleged onset date was set at May

15, 2001, and he told a doctor he had not worked since 1998, the ALJ concluded that Lemmon

had not stopped working due to disability.  Tr. 22.  The ALJ's conclusion, however, is not

supported by the record which documents Lemmon's ongoing history of memory problems, sleep

disorders, and mental health issues from prior to 1998.  Lemmon was fired from his last job in

1997 or 1998 due to issues associated with his impairments including daytime fatigue, attendance

problems, and trouble with concentration.  Tr. 79.  When questioned as to why he chose May

2001 as his onset date, Lemmon reported to DDS that he was not able to remember much about

working from 1998 to 2001, but that his condition worsened a great deal in 2001 and that is why

he chose his onset date accordingly.  Tr. 100.  Thus Lemmon believed he may have been capable

of working prior to May 2001 and did not believe he could claim disability, however his serious

health problems pre-dated his alleged onset date such that the ALJ's conclusion that Lemmon did

not stop working due to his physical and mental impairments is not supported by the record.

Next, the ALJ discounted the diagnosis of bipolar disorder by Lemmon's treating

physician, and wrote that the diagnosis did not explain Lemmon's mental situation.  However,

the ALJ did not rely on any medical evidence in the record to contradict Dr. Kasschau's

diagnosis, nor did any other physician opine that Dr. Kasschau's diagnosis was incorrect.  An

ALJ's findings must be supported by specific, cogent reasons.  Reddick v. Chater, 157 F.3d 715,

722 (9th Cir. 1998).  On April 28, 2006, Lemmon's memory problems and anger issues had

worsened, and Dr. Kasschau noted that Lemmon was not thinking clearly or able to act

appropriately to his wife and children. Tr. 507. Dr. Kasschau diagnosed bipolar disorder and
noted that the mood disorder questionnaire filled out by Lemmon and his wife was significantly
positive, that Lemmon's ongoing symptoms were consistent with this diagnosis, and that
Lemmon clearly had some affective mood disorder. Tr. 506-07. Lemmon responded well to
Depakote prescribed to treat bipolar disorder, and his symptoms decreased. Tr. 505. The ALJ's
discredit of the extent of Lemmon's mental illness by discounting the diagnosis of bipolar
disorder made by Lemmon's treating physician was error.

Overall, the ALJ relied on a minor chart note from one examining physician to support
the ALJ's conclusion that Lemmon's memory problems were not as significant as he alleged, and
that his wife was illegitimately motivated to get disability benefits for him. The ALJ does not
rely on substantial evidence from the record to support his finding, and no physician opined that
Lemmon's memory problems and personality changes were not serious and legitimate. Rather,
the ALJ relies on a minor chart note by one examining physician that noted Lemmon's
indifference to his wife's complaints regarding his memory and personality changes, and that he
had "a slight smile on his face, almost as if he knows something we don't." Tr. 198. Without
more evidence of malingering or deliberate deceit of medical professionals, however, this court
cannot find that a claimant with serious mental and physical impairments should be found not
credible because he may have smiled at an inappropriate moment during an examination. To the
contrary, Lemmon's ongoing history of mental problems suggest that inappropriate behavior such
as smiling at an inappropriate time is not remarkably telling. The neurologist who made that
chart note, Dr. Brooks, also found that Lemmon's sleep disorder issues may be affecting his
memory, that his hypersomnolence should receive further evaluation by a sleep specialist, and

that he may have psychiatric issues. Tr. 198-99. Because the ALJ made assumptions that are not

supported by the evidence of record, they are entitled to no weight.

The ALJ also discredited Lemmon in finding that he was able to wake up early to prepare

his children for school, could change the oil of his car, and slept 7-8 hours per night which would

not be considered a sleep problem. Tr. 27. However, the fact that Lemmon was able to engage

in some regular activities is not fatal to his claim unless the level of activity was inconsistent

with his claimed limitations. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Here, the

record evidence shows that Lemmon told a physician that he was no longer able to get up early in

the morning, was sleeping later each day, and still needed a midday nap. Tr. 450. Also,

Lemmon fell asleep on at least one occasion while attempting to change the oil under his car.

And Lemmon's ability to sleep at night for seven or eight hours does not change the numerous

and detailed diagnoses in the record of daytime hypersomnolence or idiopathic hypersomnia, and

his testimony that he must nap during the day. Also, some limited level of activity is not fatal to

Lemmon's assertion of disability. See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)

(claimant does not need to be "utterly incapacitated" to be considered disabled).

Finally, the ALJ questioned Lemmon's credibility in noting that Lemmon was not always

compliant with treatment and medication. As the record has made abundantly clear, Lemmon's

worsening memory difficulties caused him to forget to take medication, test his blood sugar, or

refill his medications. Lemmon testified at his hearing that he has to be reminded to take his

medication, and that sometimes, even when reminded, he cannot remember whether he has taken

his medication or still needs to do so in the course of a day. Tr. 546. His wife testified that he

cannot remember to eat, he forgets if he has something on the stove cooking, and that once he

forgot he dropped one of his children at a friend's house. Tr. 564. Physicians throughout the record noted Lemmon's cognitive dysfunction, and Lemmon was assessed as mildly retarded or with a borderline range of intelligence. Even a DDS reviewing physician found that Lemmon had marked limitations in concentration, persistence and pace. Under such circumstances, Lemmon's lack of compliance with treatment and medication may not be used to question his credibility.

Because this court finds that not one of the grounds upon which the ALJ questioned Lemmon's credibility is supported by the record, the ALJ's credibility finding is given no weight. Lemmon's testimony as to his symptoms and limitations is credited as true as a matter of law. See Lester, 81 F.3d at 834 (ALJ's improper rejection of claimant's testimony must lead to crediting that testimony as a matter of law); see also Varney v. Secretary of HHS, 859 F.2d 1396, 1401 (9th Cir. 1988). The ALJ found that diabetes, obstructive sleep apnea, a cognitive disorder or ADHD, an anxiety disorder, an adjustment disorder, pathological gambling, and bipolar disorder were severe impairments for the purpose of determining disability. Accepting Lemmon's testimony as true with regard to the limitations caused by his multiple physical and psychological problems, the record shows that he is unable to perform full-time work.

Lay Witness Testimony

Lemmon contends the ALJ wrongfully rejected the lay testimony of his wife, Valerie Lemmon, and his mother-in-law, Dorothy McCluskey. The Commissioner offered no response to this argument. Lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) and (e), 416.913(d)(4) and (e). Where an ALJ disregards lay testimony, he must

provide germane reasons for doing so. Dodrill, 12 F.3d at 919. Lay witnesses are competent to testify as to a claimant's symptoms or how an impairment affects the ability to work and therefore "cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996); see also Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (friends and relatives in a position to observe a claimant's symptoms and daily activities can provide competent evidence to support medical opinions, or show how an impairment affects claimant's ability to work).

McCluskey testified that she spent one to five hours daily with Lemmon and his family. She also testified that Lemmon needs reminding to bathe, is unable to make decisions, cannot concentrate for longer than 2-15 minutes, completes little house and yardwork and only does so with prodding, needs constant reminding to complete tasks such as shopping, misplaces money, angers easily, has difficulty following written instructions, and ignores stressful situations. Tr. 111-119. The ALJ failed to mention any of McCluskey's testimony. This was error.

Mrs. Lemmon testified that Lemmon often falls asleep during the day, falls asleep in the middle of tasks or while eating, that he was fired from his last job because of his sleep problems and an inability to be productive at work, that he naps during the day, that he can no longer remember many things that he used to be able to remember, and that he must be reminded to take his medication. She also testified that he has anger outbursts and mood swings, that his personality has changed over the last few years, that he often does not realize how his actions affect others such that Lemmon is "in his own reality", that he becomes compulsively fixated on certain tasks, and that he has a gambling problem. She also testified that he cannot complete tasks that he begins except for mowing the yard. Tr. 559-570. The ALJ recounted some of Mrs.

Lemmon's testimony but did not offer germane reasons for disregarding her observations. This was error. The Commissioner offers no justification for the ALJ's failure to address the lay witness testimony. The testimony of both lay witnesses supports Lemmon's claims regarding symptoms and limitations caused by his physical and mental problems.

CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the calculation and award of benefits.

Dated this _28_ day of November 2007.

Ann Aiken
United States District Judge

Page 19 - OPINION AND ORDER